The next case on our calendar this morning is Patriarch Partners v. Axis Insurance Company. He's right. Okay. Thanks. Take your time. People are clearing the court room. Very good, then. May it please the Court, Finley Harcum for the Appellant Patriarch Partners. In this case, the Appellant Patriarch Partners is asserting that the first claim made against it for an underlying SEC claim was made during the claims made and reported period of the Axis Insurance Policy of July 31, 2011 to July 31, 2012. The SEC began an investigation in 2009, an informal investigation, and the matter was ultimately resolved in an administrative trial in 2017 where Patriarch prevailed on all counts. The SEC served a subpoena on Patriarch in February of 2012 during the Axis policy period. That subpoena was the first demand that the SEC made on Patriarch. But the policy talks about investigations being, a formal investigation or subpoena being served on and insured, right? Yes, Your Honor. That includes employees, doesn't it? It includes, in this case, a former employee. But former employees are also covered by the definition of insured, right? Yes, they are, Your Honor. Why isn't that a formal notice of an SEC investigation in 2011? In fact, Patriarch was notified almost immediately afterwards, correct? Yes, Your Honor. Why isn't that sufficient to put you on notice and to start the clock ticking on the accrual? Because first and foremost, Your Honor, under this policy there has to be an allegation of a wrongful act. And there was no allegation of any wrongful act made against anybody by the SEC in their dealings with that former employee. The former employee was agreed to voluntarily cooperate with the SEC to provide documents and information, but his counsel asked the SEC to serve a subpoena as a matter of a formality, thinking that was the most appropriate way to deal with a document request. But there was no allegation of wrongdoing on the part of anybody at that time. In fact, when the SEC served its subpoena on Patriarch in 2012, it accompanied the subpoena with a letter, which was sent to Axis and the other insurance companies, which says you should not construe the fact of this investigation as an indication by the Commission or its occurred, nor should you consider it to be an adverse reflection upon any person, entity, or security. But at the same time, on June 13th, Patriarch's outside counsel became aware of the formal order of investigation authorizing various SEC agents to issue subpoenas and so on. And that includes a statement that there may have been a violation of law. And I'm also having difficulty understanding why, with respect to what a claim was, given the breadth of the language about investigation or inquiry, and also with respect to the warranty, which has said awareness as of August 12th of facts and circumstances that would reasonably be expected to result in a claim, why that wasn't ample. There have been a lot of activity in 2011 in particular, including directly to Patriarch, that put them on notice. I don't understand why there wasn't an obligation to disclose that to a new insurer who was getting added as a layer of excess at the time, particularly in light of the discussions  Your Honor, I'll try to address them all. I know that's several different arguments that mess together, but yes. I'll try and address them all. First, the last point about the duty to disclose. There is, it's black letter law, there is no duty to disclose any information to an insurance company unless they request it. In this case, Axis requested nothing. They didn't ask. Well, they requested the warranty, and the warranty said that as of the date of this letter, neither the undersigned or any other director or officer of Patriarch is aware of any facts or circumstances that would reasonably be expected to result in a claim under the caption policy, and by that time they'd already accrued several hundred thousand dollars in legal expenses related to what became a claim. Yes, Your Honor, but the warranty applies only to claims that are reasonably likely to reach a level of the Axis policy, which is $20 million. I'm not sure I read it that way. I really, the warranty uses language of the policy about what is a claim, and it relates to the caption policy, but that just adopts, it follows the CNA policy. It's really not explicit that the insured has to estimate itself that the liability for the claim or legal expenses will reach to the excess layer. Your Honor, that was a negotiated document between the two parties, and both parties have testified to the intent. The underwriter for Axis testified that his understanding and his intent when he negotiated was that it would require a claim of $20 million. His counterpart, the in-house— What in the language of the warranty confirms that? Where it says that it's got to be a claim that would be covered under the policy. It doesn't say covered. It says to result in a claim under the caption policy, which I understand to mean a claim as defined in the caption policy, unless I'm misunderstanding or overlooking something. Your Honor, there are two different places. There's that one— And you agree it says a claim under the caption policy, not covered by, right? Yes, Your Honor. Again, both parties testified to their intent as to what that means. And if both parties testified, it means a claim has to reach $20 million. But didn't the broker also say that it was negotiated because Axis did not want to get hit with a claim? I'm looking for the broker language. Just a second. You know, as to something that Axis was—that the Patriarch was aware of at the time. The broker had no involvement in the negotiations of this warranty, Your Honor. And just to answer your earlier question, there is a second reference in the warranty letter itself where it says, Patriarch was aware of and would reasonably have expected to result in a claim covered by such caption policy. That was language added by Patriarch's own in-house counsel as part of the negotiation. And as she testified, it was to make clear that the requirement was the warranty would apply when you reach the $20 million layer. And my understanding is that there's testimony also that we want it to be clear in the warranty that the new limit is not for any existing circumstances. Your Honor, that was a statement made to the broker by the underwriter before they negotiated this document. That was the first position that the underwriter took. Then they negotiated this document. And the underwriter conceded and testified at his deposition that this does not mean that. So he departed from that position in negotiations with Patriarch. It's odd to me that it isn't more explicit that it says only a claim resulting in coverage in the tower, in the excess layer. It says two different ways. It results in a claim under the caption policy and then a claim covered by such caption policy. Where is the claim covered by? In the end of the second paragraph, Your Honor. And reasonably a claim covered by such caption policy? Yes. Or a future we knew were thereof. That's right. And the testimony is that the intent of that was to make clear. Another fact, for Your Honor, is that Axis has forms, and this is in the record, which make explicitly clear that the warranty applies at $1.00. If there's a claim for $1.00, the warranty would apply. Axis chose not to use those warranties. Instead, they negotiated this warranty. And again, the parties both are in agreement on what it means. You talk about language that says, any facts which would reasonably be expected to result in a claim, is that language operative or is it not? Yes, Your Honor. That counts? Yes, Your Honor. Why doesn't that take care of this? Because it says result in a claim covered by such caption. No, it says reasonably expected to. Right. Well, there's an issue of fact here as to whether or not at the time there would have been, this claim would have reasonably been expected to have exceeded $20 million. So that's why at the time of the warranty, the question was first, is there subjective knowledge of circumstances on the part of the company? And then it turns to an objective test of at that time, would a person reasonably have expected that there would be a claim that would reach a level of $20 million, which makes perfect sense because that's the underlying insurance. What Access cares about is they don't want to go into a policy thinking there's a likelihood that their policy is going to be implicated. So you know the SEC is after you and your insurance company stands behind you for, if there are any facts that reasonably may be expected, and the insurance says, I don't think the SEC is going to run this bill up to $20 million, so I don't have to tell them. Is that the argument? Yes, there was no disclosure obligation whatsoever, Your Honor. This just says if it turns out. This is an affirmative representation. That's correct. What was represented was we're not aware of any facts that we think will result in a $20 million claim. At that point, there was no claim asserted against Patriarch at all. And what triggers the $20 million that the claim, it's Access Insurance. Yes. There has to be $20 million exhausted underneath, under the primary and the lower level access policies. That's, you have to burn through $20 million before you ever get to the Access policy. And so it's perfectly logical that they said we don't want to be buying into a policy where Was the SEC investigating? They were investigating investments that were issued by Patriarch involving collateralized loan obligations. What was the gross value of the investment? I can't tell you, Your Honor. $20 million? I don't know, Your Honor. We just know that. Well, you know it's well over $20 million, don't you? I really had no involvement with it, Your Honor. But what happened, the $20 million was burned through, through defense costs. It wasn't even burned through. But also, it's got to be an expect. It was a massive issue, wasn't it? The collateralized debt obligations? There was no, there was no claim at the time, Your Honor. There was only an investigation. We have to put it in the context of the time. I know you keep saying no claim, but this says any facts reasonably likely to result, excuse me, reasonably expected to result. And at that point in time, Patriarch did not, was not aware of facts that were reasonably expected to result. We think there's fraud in your whole issue. You don't think that? There was no allegation of fraud, Your Honor. There was no allegation whatsoever of fraud at that time. Even in 2012, when the subpoena was issued, the SEC said we're not accusing anyone of any wrongdoing. But, wait a minute. I mean, Chris, the language of the policy says that a claim shall be deemed made in the case of an investigation on the date of the receipt by an insured, an insured, of a written notice from the investigating authority of an investigation. And then it specifically then includes talk about an SEC investigation, right? It includes SEC investigations, Your Honor, but there has to be an allegation of a wrongful act. So they have to say, we believe, this has to be the equivalent of an indictment, an accusation. Absolutely. There has to be an... Where does it say that in the definition of investigation? Investigation means a formal, civil, criminal, administrative, or regulatory investigation of an insured in their capacity as such. It's in the definition of claim, Your Honor, which... Well, it's not in the definition of investigation, though, right? Yes, it is. In the sense that the definition of claim includes an investigation alleging a wrongful act. It's at A183 of the record. It says a claim also includes an investigation of an insured alleging a wrongful act. There has to be an allegation of a wrongful act for any claim. Alleges stuff? I'm curious about that. So in your experience, investigations are required to allege a wrongful act? That's what the contract says, Your Honor. I read it directly to you. Investigation... But the SEC doesn't do investigations that way, right? They don't say... Yes, Your Honor. We're doing an investigation and we're alleging that you committed this crime, or you did this violation. They say we're investigating whether there's been a violation, right? Investigating whether is not an allegation of a wrongful act. There was an allegation of a wrongful act in this case by the SEC as part of the investigation. It was the Wells Notice in 2014. Okay. So your view is that investigation requires it to be something like a Wells Notice. Well... That's the only thing that's covered by investigation. No, not necessarily. If they had said, we have reason to believe you've done this and you're on notice that you're a target of our investigation and we're coming after you, then that would have satisfied this at an earlier stage. But the order of investigation says, impossible violation of sections 206.1 and 206.2. Certain persons and entities, while acting as investment advisors, may have been or may be employing devices, schemes, or artifices to defraud any client or prospective client. That's part of what the order of investigation said. Is that not enough? No, Your Honor, because the order of investigation goes on to say, we're going to authorize subpoenas to find out whether there were any violations. So this was an order for an investigation to look into whether an allegation should be made. So there's investigations to see if there was a violation and there are investigations to prove the violation that you know happened? Is that what you're saying? Your Honor, I'm just reading from what was given to Patriarch. Well, actually, this was never given to Patriarch, but this order says that this investigation is to find out whether. And it was followed with a letter to Patriarch which said, we are not accusing you of anything. We are not accusing you of anything. We're investigating. So is it your view that the warranty language that Judge Newman was pointing about, facts and circumstances that could reasonably be expected to result in a claim, that that otherwise would apply except for the only above $20 million interpretation that you have been propounding? Is that right? Not necessarily, Your Honor, because at that point, no claim had been asserted. The investigation had been an on and off thing. The SEC was continuing. Facts and circumstances, and still, though, that it was a different level of reporting or representation that the company was making at the time, that it knew of no facts or circumstances that could reasonably be expected to lead to a claim. Well, to lead to a claim of a certain amount. They were careful. I'm asking you, without regard to the amount, do you agree that that phrase, facts and circumstances that could reasonably be expected to lead to a claim, that that otherwise would cover the circumstances here in which several hundred thousand dollars of legal expenses had been incurred and the order of investigation talking about may have violated the Investment Advisors Act in the Zohar III issuance, that those would otherwise be facts and circumstances reasonably expected to lead to a claim? Do you not agree? Not necessarily, Your Honor. I think that's an issue of fact. The client, as testified, they believed they did nothing wrong, which ultimately was proven to be the case, and it was their anticipation that the investigation would go away without any claim being asserted. It turned out to be wrong. But, of course, a claim. I mean, we're talking about defense cost coverage. So the fact that your client believed they did nothing wrong and were ultimately acquitted is kind of irrelevant to that, isn't it? Well, it's relevant to the question of whether they thought there would be a claim asserted against them. If you think you've done nothing wrong, then it's your thought that a claim will not be asserted against you. If you think, all right, we're going to cooperate with the government, which they did, they're going to realize they don't have a claim, and they're going to go away. So that's where the issue of fact comes into play at that first threshold level. This policy covers legal costs. Yes, in defense of a claim. So whether you're ultimately exonerated or not, legal costs are what's at issue. That's correct, Your Honor. I was mentioning the legal costs just in the context of did they anticipate a claim. Yes, legal costs are covered if there is a claim, but they didn't anticipate that there would be a claim. Thank you very much. I will hear from Mr. Gerstein, and you have three minutes of rebuttal. Thank you, Your Honor. Thank you. This Court has correctly identified all the issues. The record is actually stronger than this Court may be aware of, but I want to start with something. I think if you look in the transcript, I may be misrecollecting how he phrased it, but when Mr. Harcum said what would satisfy even his test, I think he said if they said they had reason to believe these were true, well, the SEC formal order of investigation after they'd been investigating them for a year and a half says the Commission has information that tends to show that from, and then it has the dates, and then it says you may have committed or may be committing securities fraud. So they did say they had information that tends to show that, and in answer to this panel's question, they lost over a billion dollars, whether it's a billion five or two, I can't tell you, but over a billion dollars of investor money while the CEO, it's her own company, made $200 million doing it. So if the Court's question is was this going to be a big deal, yes. And when Mr. Harcum says eventually they won, eventually with the help of Skadden Arps, Gibson, Dunn, Williams, and Connolly, with supporting help from Sherman and Sterling, the Mortville firm, and Bruin and Richard, they got a successful order from the SEC. That's true. But in terms of the anticipated defense cost, we don't need to get to the warranty. The judge wrote a narrow opinion, but I actually like the warranty. So if you don't mind, I'd like to spend one second, just a moment. I would like you to address the warranty, particularly your opponent's allegations that there's external, there's parole evidence saying that what the covered by language means meant above $20 million. No, it did not. Is there something? Well, let me see if I can just walk you through that. That's what I meant about the record being better. Their own broker, after hearing from us, their broker was the person we were dealing with from Willis. He explained to Patriot, quote, that Axis wanted a warning because they wanted to be sure that it might turn into a claim after July 31. This is to eliminate the potential for Axis to come on the program and be immediately hit with a claim that the client knew was closed but hasn't been filed yet. Then Patriot tried to do something with the warning language and Axis rejected it. And they said, since we are simply using our excess policy, we want it to be clear in the circumstances. That's in the record at A1002. Then the same day, their broker told them, the 5X20 limit is not applicable to any existing and known circumstances. Axis relies on the warranty statement as its protection against any such known situations that might develop into a claim post-inception. And then when they tendered back the warranty to us, Patriot says, we have made revisions to our first draft, which we believe addresses the issues Axis has. What in what you just told us, though, specifically refutes the allegation that they were still looking at claims only that might reach above the 20 million, the extant $20 million tower? I'll keep going to my next one that does. I think I have to connect the dots. The SEC had told Patriot that, and I want to get the quotes, because sometimes they act like we're not quoting it, right, and I have it verbatim, so we don't have to argue about it. I had it here. I'll find it. But the thrust of it is, they say, quote, this is before this warranty is given. This will be followed up with a formal subpoena against the company. That's when they got the formal subpoena. After they got our policy and after they said, we don't know of a claim that's coming, we don't know of any circumstance, they get the subpoena. They had been told it was coming, and they tendered it as a claim under the policy. They didn't wait for 20 million to be expended. They tendered it for coverage because it's covered under the policy. Whether you have to pay may depend on whether the underlying limits are eroded. It was the August 11 letter, I think, that said, we will follow this voluntary request with a subpoena that may support the information. That's right. But then when they got the subpoena to the insurance world, they acted like, quelle surprise, we just got the subpoena. Turns out we're being investigated. They didn't mention that had been going on for a year and a half. And they asked for coverage. They didn't wait for the 20 million. And they've said, I think they've tried to argue around this later in the briefing, but they forgot in the complaint, paragraph two of the amended complaint, they expressly say that the subpoena from the SEC to them was a claim under the policy. The very language Mr. Harcum read at the bottom where it says we're not necessarily saying anything, they tendered that as a claim under the policy. They just didn't acknowledge that it already had an insurer before the policy who'd already got a similar subpoena. Before the policy? Yes. They, they, when they got the access policy, they were already under formal investigation by the SEC. They had received form 1662s, which is how a claim is deemed made. They, an insured had received an order of formal investigation and insured had received a subpoena in three different ways. A claim had been made before the policy incepted. What, what follows from what you just said? Is it that having made what you, what you say they made a claim, does that stop them from denying that it's a claim? No. Or is that evidence that it is a claim? It's, it makes it not covered here because the claim preceded the policy. Access, all the other insurers. But his statement that they made a claim. Oh, I see what you're saying. I'm, I'm wondering if you're saying that creates some sort of an estoppel, they can't deny it or the fact that they said it is evidence that under this policy, it is a claim or something else. I don't mean to lie. I, it's in, since it's an allegation in their complaint and it's not been changed, I think it should have stopped them. But regardless on this point, a claim covered under the policy doesn't say, you'll see in their brief when they describe it, they describe it as if it says you must spend exactly this money. But it misses the obvious underwriting point. When for a $47,000 premium, you're issuing a $5 million policy and you say you don't want to step into an existing situation. Part of the protection is you're sitting north of $20 million. If someone, if a claim comes in under the policy, even if it doesn't reach your limits, it just eroded the $20 million underneath your policy. You want to know if there's something they expect to come in under the policy and it's not for them to decide if it'll reach your limits. Their own broker said they didn't tell him about the SEC investigation. He would have expected them to and he would have disclosed it because it's a quote, big deal to insurers. I mean, in all honesty, had they said we're under securities fraud investigation, there is zero chance this policy would have been issued. And I think they knew that. So, Judge Capone wrote a nice, narrow, simple opinion that's dead right. There's some ambiguity though in the language on the binder. First of all, the binder was in effect for six months and there is, it's not entirely clear what the endorsement refers to, whether it is the CNA policy or whether it's what was later issued with the language of Axis or something else. It doesn't speak in a full sentence. It's unclear what it is. And so, we need to import some, either apply the CNA or look to what later claim and then go through the tangle of what's a claim, what's an investigation and what's the allegation of wrongdoing. The short answer is that Judge Capone took the narrowest view. She just accepted their view that the four-word cryptic statement in the binder was the equivalent of the endorsement. I could show you legally why that's not necessary to do. She was just conservatively giving them the benefit. They were saying it had to be a claim within the meaning of the policy. And our, and her answer, mine would be the same. Of course, it's a claim because the policy says a claim is made when form 16, out of investigation. But how do you answer the allegation of wrongdoing? The language in the CNA policy suggests that applies to all categories above the, you know, that are listed in this investigation. What constitutes an allegation of wrongdoing here? Luckily, I can answer that broadly, but I have a narrow answer that wins the case. So, I'll stick with that for now, okay? The policy, you go to the definition of wrongful act, which is in the record and I think page 190. And what you will see is when an individual insured gets a claim, a demand, in this case a subpoena, it doesn't require what in English parlance would be a wrongful act. And the way you know that is the definition of wrongful act starts with all of the traditional actual or alleged act, neglect, omission. I'm looking at it now. Okay. Wrongful act means any actual or alleged error statement, misstatement, misleading statement, so on. Then look at number one under that. By an insured person. Now, watch the or. Read after the word or. In his or her capacity as such or any matter claimed against such insured person solely by reason of his or her status as such. Right. And that latter language is in there for very obvious and specific reason. If you see, for the company it has to allege something, again, a target of investigation, at least in insurance parlance, is subject to investigation alleging. That's patriarch. But this is the provision that frankly most directors like. It's just in this case it doesn't help them. But this is the provision that basically says if you get a subpoena, if you're a former officer or current office director, you get a subpoena related to your work for the company, it doesn't have to allege a wrongful act. It's deemed a wrongful act, which makes it a little circular because it's the definition of wrongful act. But it's saying if you get a demand, in this case a subpoena, that's covered. And so when Topas, before this policy was purchased, got a subpoena, that was a claim under the policy. And it literally is a claim for a wrongful act because of the definition of wrongful act, which says any matter claimed against him by reason of being a. But Judge Caproni didn't rely on that, did she? Well, she said a wrongful act wasn't required. And that's literally true. But it's only true because wrongful act defines that that way. It's just an odd feature. But it frankly in most cases is great for the insurance. It just happens here they were trying to get $5 million of extra coverage for an investigation. I know a lot of insurance are going to remind you of this argument. Mr. Harkins made that point too. But this is very broadly worded SEC coverage. In fact, if you look through their cases they cite, they're always ones with a distinction. Like one diamond, it required an indictment. In Muscle Farm, it was triggered under that policy by Wells Notice. I mean, these policies are all worded differently. This happens to be extremely broadly worded. But, so you can affirm just based on her ruling on the warranty. I don't personally believe under the reasonable person test, when you've lost more than a billion dollars in investor money while you made $200 million doing it. And this SEC- When were those figures apparent? My belief is long before all of it, or at least, again, whether it crystallized. The magnitude was clear. The magnitude was- August 12, 2011. Yes. Okay, thank you. Thank you very much, Mr. Harkin. Thank you, Your Honor. With respect to the Mr. Gerstein's statement that the subpoena was tendered as a claim by Patriarch. That is incorrect. In 2012, Patriarch's broker submitted the subpoena as a notice of a new matter. That's insurance broker parlance for insurance companies. We're tendering it. We're giving you notice of something going on, and you figure out how to treat it. It was not a demand for coverage from day one from Axis. What does that mean, you figure out how to treat it? What does that mean? Because, Your Honor, there are two different ways that coverage can be triggered under a policy. One is you say there's a claim asserted against us, and your policy is up. You owe us defense. The other way is to give notice of a circumstance that may reasonably be expected to lead to a claim. That's in the Axis policy. It's in all of these policies. And so brokers typically will give notice of a new matter so that it's clear that we want to get whatever coverage is available to our client here. And in a tariff situation, you give notice only to the one you think the layer you think might cover? Or do you give notice to all your insurers? They gave notice to all of the insurers because a claim has to be reported during the policy period. That's claims made coverage. Unlike an occurrence where you can wait upon other policies, you can wait until down the road when it becomes more apparent. So they gave the notice, but they weren't asking- Warranties about what's pending. In this case, you say speak only to when you think the coverage might be invoked. That's right. That's the warranty, but that's not- Isn't that kind of an odd misalignment with the notice obligation? No, Your Honor, because the warranty doesn't impose any affirmative obligation. It works as an exclusion. It says if you ever get to us, if there's ever a claim for coverage specifically under our policy, we're entitled to go back and look and figure out were you aware of circumstances that were reasonably likely to give rise to a claim that reached our policy. And that's what happened here. For the five years or so, Axis sat back and did nothing. And after the claim finally reached their layer, then they investigated further and decided, no, the warranty applies here because you were aware of facts and circumstances that were reasonably likely to give rise to a claim of this size. But the important fact is not how much business Patriarch was doing at the time the SEC was investigating. The important fact is they had only spent, I think, a total of $600,000 after three years of investigation at the time that this order was issued, at the time the warranty was issued. There was no reason to believe whatsoever that this was going to end up being a $20 million problem. There was no Wells Notice. There was no statement by the SEC that it was going to file a claim or assert any wrongdoing by Patriarch. They'd spent some hundreds of thousands of dollars voluntarily complying with it, with a request for voluntary compliance with the SEC. Could you address Mr. Gerstein's argument that the wrongful act definition doesn't require the allegation of a particular wrongdoing as to when an insured gets notice? Yes, Your Honor. I think that that is, first of all, it's a nonsensical interpretation in the context of the policy of the whole. The policy requires a wrongful act. And what Mr. Gerstein is arguing is, well, but within the definition of wrongful act, there's a carve out. All you have to do is ask for something from somebody. First of all, it's got to be a request for non-equitable relief. It's not just ask for something. So there is coverage for a claim, for a demand for non-equitable relief. And as numerous courts, including the second, rather the Southern District in the Diamond Glass case, the Sixth Circuit in Promerica, the Tenth Circuit in Mussel Farm, they've all said that a subpoena is not a demand for relief. Relief is something that you get from a court, something that you get from a tribunal. This is a request for documents. But accompanied by a formal order, right? A formal order of investigation. If it was just a subpoena, that might be an argument. But this was a subpoena that was also accompanied by an SEC formal investigation notice, right? No, Your Honor. Well, the subpoena to the former employee, not the subpoena to Patriarch. Subpoena to the former employee. Wait, wait. Former employee is an insured. There's no question about that, right? But he's not the insured who was the target here. And I don't think it's a fair reading of the policy to say, if you've got a company with 1,000 former employees and you issue a subpoena to one of them who has nothing to do with the matter at all, that that now triggers a claim under the policy. And what's more, that— Wait, I want to be clear on this. Investigation means a formal, civil, criminal, administrative, or regulatory investigation of an insured. An insured. And your view is that that language means only Patriarch. No, no, no. It can be an investigation of any insured. I'm saying that notice to the former employee should not be considered notice to Patriarch in this context, particularly because— But Patriarch had notice of this. I mean, that might be an interesting theoretical question. But Patriarch knew this in real time. They knew it the next day, right? They were aware that the SEC requested voluntary cooperation and that at the request of the former employee's lawyer, then the SEC issued a subpoena. But that's not what the SEC— And an order directing private investigation. In other words, the formal investigation notice also was produced and received by Patriarch, correct? No, but it was known to Patriarch's lawyer. It was never served upon Patriarch. Not served. They were aware of it. Patriarch's lawyer was aware that there was a formal order of investigation, but it does not assert a claim. And I'd like to—if we could go back to the language of that order. I mean, it says there are all kinds of qualifiers in addition to the fact that it's— All kinds of qualifiers about what? About whether there's an allegation, Your Honor. It says these individuals may have been making use or means of instrumentalities. If true, that's a possible violation. It's qualified—every single paragraph of this order qualifies it with maybe somebody has done something and if they've done something, then maybe it's a possible violation of a law. And then they go on and say, we're just—this is an investigation to find out if it happened. And then they turn around and the very first thing they did is tell—to Patriarch was to say this investigation is not accusing you of anything. So it'd be elevating form over substance to say, we're going to read this order in a way that clearly was not intended by the SEC, which the SEC said in black and white was not what it intended by the order. So investigations require—they are accusatory documents as far as you're concerned? It—to qualify as a claim under this policy. That's what the policy says, Your Honor. All right. Thank you very much. I think we have the arguments. We'll reserve decision. Thank you.